**VILLAGE OF FALSE PASS, et al., Plaintiffs-Appellants, Cross-Appellees,**

**v.**

**William C. CLARK, et al., Defendants-Appellees, Cross-Appellants,**

**Amoco Production Company, et al., Intervenors.**

**Nos. 83–3989, 83–3990, 83–4003 and 83–4036.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 6, 1984.

Decided March 12, 1984.

Rehearing and Rehearing En Banc Denied May 24, 1984.

Eric Smith, Trustees for Alaska, Anchorage, Alaska, Lynne Edgerton, Sarah Chasis, Natural Resources Defense Council, New York City, for plaintiffs-appellants.

Carl J.D. Bauman, Joe Loescher, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, Alaska, David C. Shilton, Dept. of Justice, Washington, D.C., E. Edward Bruce, John T. Smith, II, Covington & Burling, Washington, D.C., for intervenors.

Before KILKENNY, WALLACE and CANBY, Circuit Judges.

WALLACE, Circuit Judge:

The Village of False Pass, another village, one individual, and eight organizations (Village) appeal from a denial, in part, of summary judgment in their action for

declaratory and injunctive relief against the Secretary of the Interior's (Secretary) proposed sale of oil leases in the St. George Basin of the Bering Sea. The Secretary and various intervenor oil companies cross-appeal the partial summary judgment and an injunction against them. The case involves an important marine environment, rare whales, large sums of money, a search for increasingly scarce energy resources, and three basic statutory schemes: the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq.* (OCSLA), the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.* (NEPA), and the Endangered Species Act of 1973, 16 U.S.C. § 1531 *et seq.* (ESA). We have jurisdiction under 28 U.S.C. § 1291, and affirm the ruling on appeal. We do not reach the ruling on cross-appeal.

I

The St. George Basin, located off the west coast of Alaska in the Bering Sea, is a rich and diverse marine area, home to many animals and "the gateway to virtually every marine mammal, fish, and bird species moving between the North Pacific and the Bering Sea." *Village of False Pass v. Watt*, 565 F.Supp. 1123, 1129 (D.Alaska 1983). It may also hold large oil and gas reserves, perhaps 1.12 billion barrels of extractable oil. *Id.* at 1139. Although the chances of discovering such commercial quantities of oil or gas are about 28% and 37% respectively, *id.* at 1130, the oil companies bidding on St. George Basin leases are willing to spend almost a half-billion dollars for the right to investigate those chances on the specific parcels of Lease Sale 70.

The planning for Lease Sale 70 began in 1979 when the Department of the Interior's Bureau of Land Management requested resource reports from various agencies about oil and gas leasing in the St. George Basin. In early 1980, the Secretary designated 479 parcels as Lease Sale 70, and by the fall of 1981 he had prepared a Draft Environmental Impact Statement for the sale. In the summer of 1982, the Secretary asked the National Marine Fisheries Service (Fisheries Service) to prepare a Final Biological Opinion about the effects of the proposed lease sale on fish and marine mammals. That December, the Secretary issued a Final Environmental Impact Statement (Final Statement) that included information from several agencies' impact studies, among them preliminary biological studies from the Fisheries Service. Although the Final Statement provided two sets of oil spill analyses, one for spills over 1,000 barrels and one for spills of 10,000 barrels or more, it did not provide an explicit worst case analysis for oil spills of 100,000 barrels.

On March 7, 1983, the Secretary signed a Final Notice of Sale for Lease Sale 70. The Final Notice did not require any particular seasonal drilling or exploration restrictions, although several interested parties had suggested them. It did inform potential lessees that the Secretary retained power to impose such restrictions. Two days later the Secretary received the Fisheries Service's Final Biological Opinion. The Opinion recommended that "exploratory drilling and associated activities should be conducted ... only at times and in locations where [the Department of the Interior] can ensure these areas will remain free of spilled oil" and that the Secretary plan seismic testing both preliminary to and during exploration to avoid adverse effects on gray and right whales.

Soon after the Final Notice issued, the Village sued to declare that the Secretary acted arbitrarily and that his decisions were based on inadequate information, and to enjoin the lease sale. It claimed, among other things, that the lease sale decision violated ESA because the decision took place two days before receipt of the Fisheries Service's Final Biological Opinion; violated ESA because the decision did not include specific drilling and seismic testing limitations to protect endangered gray and right whales; and violated NEPA because the Final Statement did not include a worst case analysis of "large" or "major" oil spills, and the impact of Lease Sale 70 on the resources of the St. George Basin, in-

cluding whales. After some initial proceedings, the Village, the Secretary, and the intervenors all moved for summary judgment, which the district court granted in part and denied in part to each.

In his Order following summary judgment, the district judge enjoined execution of leases under the lease sale until the Secretary prepared either a worst case analysis or supplemental environmental impact analysis of the effects of seismic testing before the exploration stage on gray and right whales, reconsidered his Final Notice of Sale after that analysis, and included in the Final Notice or another order either the Fisheries Service's suggested reasonable and prudent exploration and drilling restrictions to protect the whales, or a justification of why such restrictions were unnecessary. *Village of False Pass v. Watt,* 565 F.Supp. at 1165–66.

On appeal, the Village argues first that the district court erred in not finding the Secretary violated the "inter-agency consultation" and "best available data" requirements of ESA by issuing a Final Notice of Sale two days before receiving the Fisheries Service's Final Biological Opinion. Second, it claims the district court erred by failing to require the Secretary to adopt "concrete measures" at the lease sale stage, such as tract deletion or seasonal drilling restrictions, to protect gray and right whales under ESA from oil spills and seismic testing. Finally, the Village argues the district court improperly refused, under NEPA, to require a worst case analysis at the lease sale stage of "the effects" of oil and gas activity on all species in the St. George Basin. Although it did not initially limit its argument to the need for a worst case analysis of a 100,000 barrel spill, in its briefs and at oral argument the Village acknowledged it seeks only worst case analyses of a "major oil spill" of 100,000 barrels or more. Cross-appealing, the Secretary and the intervenor oil companies argue that the district court erred under NEPA in requiring a worst case analysis, or supplemental environmental analysis, of impacts of seismic surveys preliminary to the exploration stage on gray and right

whales. We will address the Village's arguments under ESA, and then the NEPA claims. Before doing so, however, we describe the larger context of the appeals: the structure of oil and gas exploration under OCSLA.

## II

The Supreme Court recently explained the basic structure of OCSLA in *Secretary of the Interior v. California,* —— U.S. ——, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984). Three of the four statutory stages identified by the Court for developing an offshore oil well concern us: lease sales, *see* 43 U.S.C. § 1337(a); exploration, *see* 43 U.S.C. § 1340(b); and development and production, *see* 43 U.S.C. § 1351(a). *See generally Secretary of the Interior v. California,* —— U.S. at ——, 104 S.Ct. at 669. These stages are separate and distinct. As the Court stated, "by purchasing a lease, lessees acquire no right to do anything more. Under the plain language of OCSLA, the purchase of a lease entails no right to proceed with full exploration, development, or production ... the lessee acquires only a priority in submitting plans to conduct those activities. If these plans, when ultimately submitted, are disapproved, no further exploration or development is permitted." *Id.; see also id.* at ——, 104 S.Ct. at 671. "Each stage involves separate regulatory review that may, but need not, conclude in the transfer to lease purchasers of rights to conduct additional activities on the OCS." *Id.* at ——, 104 S.Ct. at 669. Although the present case applied OCSLA in a different factual situation, there is no doubt that we are bound by the Court's analysis of OCSLA.

In prescribing this structure for oil and gas leasing, OCSLA makes no direct reference to ESA. The general provision on enforcement of environmental standards simply specifies that "in enforcement of safety, environmental, and conservation laws and regulations, the Secretary shall cooperate with the relevant departments and agencies ...." 43 U.S.C. § 1334(a).

*Cf.* 43 U.S.C. § 1866(a) (OCSLA, unless expressly provided, does not modify other laws). The Secretary must cooperate in enforcement, as OCSLA provides, but ESA applies of its own force and effect. *See, e.g., Secretary of the Interior v. California,* —— U.S. at ——, 104 S.Ct. at 670 (ESA applies at lease sale stage).

OCSLA does make reference to NEPA, however. *See* 43 U.S.C. §§ 1331(p), 1344(b)(3), 1346(a) (by implication), 1351(e)–(h), (k). It specifically does not limit NEPA's basic application, *see* 43 U.S.C. § 1866; instead, the two statutory schemes are complementary. In sections 1346 and 1351, OCSLA requires preparation of a full environmental impact statement. At the lease sale stage, OCSLA implies this review must meet NEPA standards. *See* 43 U.S.C. § 1346(a)(1) ("The Secretary shall conduct a study ... in order to establish information needed for assessment and management of environmental impacts ...."); *see also Secretary of the Interior v. California,* —— U.S. at ——, 104 S.Ct. at 670 (NEPA applies at the lease sale stage); *Massachusetts v. Watt,* 716 F.2d 946, 948 (1st Cir.1983); 46 Fed.Reg. 7494 (Jan. 23, 1981). At the development and production stage, the implication is even clearer. *See* 43 U.S.C. § 1351(e)(1) ("At least once the Secretary shall declare the approval of a development and production plan in any area ... to be a major federal action [and thus trigger NEPA].").

Under the three steps for specific offshore oil and gas development, therefore, OCSLA appears to require the application of NEPA at both the lease sale and development and production stages. That does not foreclose its application also at the exploration stage. By NEPA's own terms, it applies to "every ... major Federal action[ ] ...." 42 U.S.C. § 4332(2)(C). Thus, as the Secretary's regulations promulgated under OCSLA indicate, NEPA may apply of its own force to the exploration stage, too. *See* 30 C.F.R. § 250.34–4(a) (1982) ("Prior to approval of an *exploration* or development and production plan, ... the Director [of the Minerals Management Service] shall review the environmental impacts ... to determine ... whether approval ... constitutes a major Federal action ... requiring preparation of an Environmental Impact Statement pursuant to [NEPA] ....") (emphasis added).

■ Thus, it is clear that OCSLA prescribes three distinct stages for offshore oil and gas activities: leasing, exploration, and development and production. ESA appears to apply equally to each stage of its own force and effect. Under OCSLA's general environmental provision, NEPA also applies to each stage of its own force and effect. OCSLA's specific references to NEPA at the leasing and development and production stages, however, provide additional impetus for its application. Those specific references also emphasize the discrete nature of each stage. Our analysis of this case, therefore, requires us to take into consideration the three separate stage approach of OCSLA.

### III

As we have seen, ESA applies to OCSLA. The Village makes two arguments under ESA concerning endangered gray and right whales. First, the Village argues that the Secretary violated the "interagency consultation" and "best available data" requirements in 16 U.S.C. § 1536(a)(2) by issuing his Final Notice of Sale two days before receiving the Fisheries Service's Final Biological Opinion on Lease Sale 70. Second, the Village says the Secretary failed to insure that his actions were "not likely to jeopardize the continued existence of any endangered species," *id.,* because he did not adopt, at the leasing stage, specific measures protecting whales from oil spills and seismic testing, such as seasonal drilling restrictions or tract deletions.

Because ESA contains no internal standard of review, section 706 of the Administrative Procedure Act, 5 U.S.C. § 706, governs review of the Secretary's actions. *See Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson,* 685 F.2d 678, 685 (D.C.Cir.1982). The Secretary's actions were not "adjudicatory in

nature" and the Village did not raise "issues that were not before the agency" in its ESA claims, *see* 5 U.S.C. § 706(2)(F) (narrow exceptions for de novo review), so the normal "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" standard applies. 5 U.S.C. § 706(2)(A). *See Cabinet Mountains Wilderness v. Peterson*, 685 F.2d at 686; *National Wildlife Federation v. Coleman*, 529 F.2d 359, 371–72 (5th Cir.), *cert. denied*, 429 U.S. 979, 97 S.Ct. 489, 50 L.Ed.2d 587 (1976), *citing Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). We review the district court's legal conclusions under that standard de novo.

### A.

■ The Secretary has promulgated regulations to fulfill ESA's command that he consult an appropriate agency to insure his actions are not likely to jeopardize an endangered species. *See* 16 U.S.C. § 1536(a)(2). The regulations require that "[u]ntil consultation has been completed and a biological opinion issued, good faith consultation shall preclude a Federal agency from making an irreversible or irretrievable commitment of resources which would foreclose the consideration of modifications or alternatives to the identified activity or program." 50 C.F.R. § 402.04(a)(3) (1982); *see also* 16 U.S.C. § 1536(d). The Village admits that the lease sale is not an irreversible or irretrievable commitment of resources. *See generally Conservation Law Foundation of New England, Inc. v. Andrus*, 623 F.2d 712, 715 (1st Cir.1979). From this we may conclude the Secretary did not breach the good faith consultation requirement of section 402.04(a)(3) simply by issuing his Final Notice of Sale before receiving the Fisheries Service's Final Biological Opinion. To that extent, the Secretary did not abuse his discretion.

In addition, the Secretary was briefed on a draft version of the Final Biological Opinion a week before he signed the Final Notice of Sale. The district court recognized that the draft version and the final version of the Opinion differed slightly, 565 F.Supp. at 1160 n. 24, but found the differences unimportant, *id.* at 1160. Clearly, the Secretary was pursuing the consultation required by ESA in examining the draft Opinion before giving his Final Notice of Sale. The Village, however, argues that the difference between the draft version and final version of the Opinion shows the Secretary did not act on the "best scientific ... data available." *See* 16 U.S.C. § 1536(a)(2). Nothing in the draft Opinion indicates it included less than the best scientific data available. We need not decide whether the Secretary abused his discretion by acting on that data, however, because the issue is moot. Following the district court's decision, the Secretary issued a Final Supplemental Environmental Impact Statement (Supplemental Statement) incorporating the Final Biological Opinion, *see* 50 C.F.R. § 402.04(g) (1982) (final opinion shall be stated in documents required by NEPA), and reconfirmed his Final Notice of Sale decision, *see id.*

### B.

■ In its second ESA argument, the Village claims the Secretary may defer imposing specific protections for endangered whales, such as seasonal drilling restrictions, until after the lease sale only if it is not feasible for him to adopt them at the lease sale stage. We disagree.

Under 16 U.S.C. § 1536(a)(2), the Secretary must, among other things, insure his lease sale decision "is not likely to jeopardize the continued existence of any endangered species." In its Final Biological Opinion, the Fisheries Service suggested several reasonable and prudent alternatives the Secretary might follow in the St. George Basin to meet this requirement. *See generally* 16 U.S.C. § 1536(b)(3)(A). None of the suggestions specifically required seasonal drilling restrictions or tract deletions. The Fisheries Service said seismic testing near the Unimak Pass should take place only "in a manner that does not disturb" the migration of gray whales. Similarly, exploratory drilling and associat-

ed activities should take place when gray and right whales utilize the area

only at times and in locations where DOI [the Secretary] can ensure that these areas will remain free of spilled oil. In determining the necessary measures to provide this assurance, DOI should carefully consider critical factors such as the time necessary for lessees to control a blowout and cleanup [sic] spilled oil as well as the environmental conditions that may affect the time necessary for cleanup.

The generality of these recommendations, a generality the Village acknowledges, implies the Secretary may choose particular methods to fulfill the recommended aims *after* the lease sale. The cover letter to the Final Biological Opinion acknowledges this: "[n]ew information on the timing, location, and nature of activities associated with OCS oil and gas leasing and exploration, and exploration plans and permit applications should be reviewed by the DOI on a case-by-case basis to determine if additional consultation pursuant to Section 7 is required." The Fisheries Service also reached an agreement with the Secretary for monitoring activity after the lease sale. The Secretary must consult informally and "provide [the Fisheries Service] with all seismic permits, and with exploratory drilling plans, and with any subsequent revisions of such plans. [and] ... Formal consultation ... must be reinitiated upon commencement of the development and production phase ...."

For his part, the Secretary has placed special disclaimers in the Final Notice of Sale that specify his continuing control of any post-sale drilling. For example, Information to Lessees Clause (1) of the Final Notice of Sale states that the Secretary "retains authority to suspend drilling activity whenever migrating whales are near enough to be subject to the risk of spilled oil" and that he may "order cessation of exploratory drilling" during the gray whale migration season. *See* 565 F.Supp. at 1161. The Secretary also retains full control of

seismic testing during the exploration stage.

The Village characterizes these factors as "only a plan for later action." We conclude that, given the Fisheries Service's general recommendations about oil spills and exploration stage seismic testing, the Secretary could properly limit his action at the lease sale stage to a plan for later implementation. The ESA applies to every federal action. *Compare* 16 U.S.C. § 1536(a)(2) (ESA provision requiring agencies to insure that "any action authorized, funded, or carried out ... (... 'agency action') is not likely to jeopardize" endangered species) *with* 42 U.S.C. § 4332(2)(C) (NEPA provision requiring impact statements for every "major Federal action[ ] significantly affecting the quality of the human environment"). Both the Supreme Court and the implementing regulations to ESA interpret "agency action" broadly. *See TVA v. Hill*, 437 U.S. 153, 173 & n. 18, 98 S.Ct. 2279, 2291 & n. 18, 57 L.Ed.2d 117 (1978); 50 C.F.R. § 402.02 (1982) (agency "activities" means "all actions of any kind" including "the granting of licenses ... [or] permits ...."). The lease sale decision itself could not directly place gray or right whales in jeopardy, and the plan insures that the many agency actions that may follow indirectly from the sale will not either.

By choosing this plan, however, the Secretary recognizes his obligation under ESA to implement it. *See generally Conservation Law Foundation of New England, Inc. v. Andrus*, 623 F.2d at 715. With each exploration plan, development and production plan, or permit to drill, the Secretary must: implicitly conclude that any approval does not affect an endangered species, *see* 50 C.F.R. § 402.04(a)(2) (1982); take appropriate steps to insure, on the basis of his previous consultation with the Fisheries Service, the absence of jeopardy to an endangered species; or reinitiate formal consultation, *see, e.g., Village of False Pass v. Watt*, 565 F.Supp. at 1161 & n. 28 (strong suggestion that formal consultation about oil spill risks on whales will be required at

the exploration stage); 50 C.F.R. § 402.-04(h) (1982).

The monitoring agreement with the Fisheries Service will help the Secretary take these steps and diligently pursue ESA compliance after the lease sale, *see Village of False Pass v. Watt,* 565 F.Supp. at 1161. The Secretary's own regulations require an environmental report from each lessee for each exploration plan, 30 C.F.R. § 250.34-1(a)(2)(i) (1982), and development and production plan, 30 C.F.R. § 250.34-2(a)(3)(i) (1982). Approval of these plans may even require a full environmental impact statement. *See* 30 C.F.R. § 250.34-4(a) (1982); *see also* 43 U.S.C. § 1351(e) (OCSLA); 42 U.S.C. § 4332(2)(C) (NEPA). Even if not a full environmental impact statement, these reports and plans must include information about marine mammal use of the area. *See* 30 C.F.R. § 250.34-3(a)(1)(i)(G)(*4*) (1982) (exploration report; "identification of endangered species and their habitats that could be affected"); 30 C.F.R. § 250.34-3(b)(1)(i)(F)(*4*) (1982) (development and production report). This means that the Secretary will have precise, site-specific information in each case to insure the best compliance with ESA.

These regulations, promulgated in part under OCSLA, help make the Secretary's plan a real safeguard. Neither the regulations, nor OCSLA itself, dilute the full application of ESA to actions by the Secretary. *See Conservation Law Foundation of New England, Inc. v. Andrus,* 623 F.2d at 715 (the standards of OCSLA and ESA are complementary). We therefore affirm the holding of the district court that the Secretary did not abuse his discretion under ESA at the time of the lease sale action with respect to endangered species protection from oil spills and exploratory seismic testing.

### C.

■ The district court also held, however, that the Secretary had abused his discretion with respect to endangered species protection from preliminary seismic testing occurring before the exploration stage. We assume from the opinion of the district court that this abuse of discretion flowed both from insufficient consideration of the problem of preliminary seismic testing in the Final Statement, a NEPA problem, and from failure to act or explain inaction on the Final Biological Opinion recommendations, an ESA problem. *See* 565 F.Supp. at 1163. Following the district court's judgment, the Secretary prepared the Supplemental Statement considering preliminary seismic testing, and adopted seasonal and operational restrictions on such testing in Notice to Lessees No. 83-4. The district court has already ruled that those restrictions were satisfactory on a motion for relief from injunction under Fed.R.Civ.P. 60(b)(5). We therefore conclude that the cross-appeal is moot.

### IV

In its NEPA argument, the Village claims the Secretary, by preparing the Final Statement for Lease Sale 70 without including a worst case analysis, failed to observe the procedure required by law. The particular type of worst case analysis the Village seeks at the lease sale stage "is one in which a large spill of 100,000 bbl or greater is assumed to occur" under poor conditions, affects various sealife "including a substantial part of the gray and right whale populations," lingers in the environment, and causes "physiological impacts, about which there is uncertainty at present, [that] are assumed to be the worst." This argument essentially conflates two strands of analysis by the district court.

First, the district court concluded "that the leasing stage environmental impact statement need not include speculative or uncertain information concerning potential or anticipated environmental consequences affecting only exploration or production stages of an oil lease. The catastrophic spill envisioned by the plaintiffs is such an event." *Village of False Pass v. Watt,* 565 F.Supp. at 1148. Second, the district court went on to consider the need for particular worst case analyses of oil spill (of whatever

size) and preliminary seismic testing impacts on whales. The issue of preliminary seismic testing impacts on whales is, as pointed out in the section on the Village's ESA claims, moot. As to the other impacts, the district judge held: "I cannot conclude that the missing oil spill information is essential to a reasoned choice among the alternatives at this time." *Id.* at 1152. His underlying reasoning was that Lease Sale 70 proceeds in stages, oil spills occur only at stages after the lease sale stage, and additional environmental information about that impact will become available and should be considered at those subsequent stages. Therefore, he concluded, NEPA did not require worst case analyses at the lease sale stage. *Id.* at 1152–53.

We review the adequacy of the Final Statement under the "prepared in observance of the procedure required by law" standard of 5 U.S.C. § 706(2)(D): does the Final Statement contain "a reasonably thorough discussion of the significant aspects of the probable environmental consequences," *California v. Block,* 690 F.2d 753, 761 (9th Cir.1982), *quoting Trout Unlimited, Inc. v. Morton,* 509 F.2d 1276, 1283 (9th Cir.1974); *see also Columbia Basin Land Protection ' Association v. Schlesinger,* 643 F.2d 585, 592–93 (9th Cir. 1981), and does its "form, content and preparation foster both informed decision-making and informed public participation," *California v. Block,* 690 F.2d at 761; *Warm Springs Dam Task Force v. Gribble,* 565 F.2d 549, 552 (9th Cir.1977) (per curiam); *Trout Unlimited, Inc. v. Morton,* 509 F.2d at 1283; *see also Save Lake Washington v. Frank,* 641 F.2d 1330, 1334 (9th Cir.1981). Once satisfied that the Secretary has taken this procedural and substantive "hard look" at environmental consequences in the Final Statement, *see Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976); *California v. Block,* 690 F.2d at 761, our review is at an end. We now consider whether, under the Council on Environmental Quality regulations implementing NEPA, read in light of OCSLA, the Secretary's Final Statement satisfies this "hard look" standard of *California v. Block* without undertaking a worst case analysis of a 100,000 barrel oil spill.

### A.

The Council on Environmental Quality (CEQ), established under 42 U.S.C. § 4342, promulgates uniform, mandatory regulations for implementing the procedural provisions of NEPA. *See Andrus v. Sierra Club,* 442 U.S. 347, 357, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979); *National Indian Youth Council v. Watt,* 664 F.2d 220, 224–25 (10th Cir.1981); Exec. Order No. 11991, 3 C.F.R. 124 (1978); 40 C.F.R. § 1515.2 (1982). Recognizing that the universe of information about environmental impacts remains incomplete in many cases, the CEQ promulgated 40 C.F.R. § 1502.22 (1982). Under this regulation, an agency must prepare a worst case analysis in two instances:

> If (1) the information relevant to adverse impacts is *essential to a reasoned choice among alternatives* and is not known and the overall costs of obtaining it are exorbitant or (2) the information ... is *important to the decision* and ... (... the means for obtaining it are beyond the state of the art) the agency .... [if it proceeds] shall include a worst case analysis ....

40 C.F.R. § 1502.22(b) (1982) (emphasis added).

The district court apparently found the incomplete information on the effects of oil spills was not "essential to a reasoned choice among alternatives." 565 F.Supp. at 1152–53. The district judge did not state his findings and reasoning why his worst case analysis should be based upon "essential to a reasoned choice" as distinguished from "important to the decision." *See id.* at 1148. We are initially confronted with the question of whether a remand is necessary to determine the basis of the standard adopted by the district court.

■ When confronted recently by a similar situation, we concluded that we could proceed with our disposition of the appeal.

Because the missing information was "significant," we concluded it was unnecessary to distinguish between "essential" and "important" in that case. *Save Our Ecosystems v. Clark,* Nos. 83–3908, 83–3918, 83–3887, and 83–3916 (9th Cir. Jan. 27, 1984). While we have expressed some doubt as to the wisdom of the distinction in the regulation, *id.,* district courts should attempt to apply its mandate. Therefore, we believe a district court reviewing a worst case analysis claim under NEPA should make clear the basis for its decision by choosing one of the two applicable CEQ standards, explaining the basis for that choice, and then applying the chosen standard.

■ As we concluded in *Save Our Ecosystems v. Clark,* however, in this particular case remand is not required. The parties agree that the "important to the decision" standard applies and apparently believe that if it does not justify a worst case analysis neither would the "essential to a reasoned choice" standard. They have briefed and argued the case applying the "important to the decision" test and we see no harm in our reviewing this appeal by that standard. This approach is similar to that used by the Fifth Circuit in *Sierra Club v. Sigler,* 695 F.2d 957, 973 (5th Cir. 1983), where the court decided the missing information was beyond the state of the art and reviewed the case based on the "important" standard in spite of the district court's use of the "essential" test.

### B.

■ The Village would have a better argument for the importance of a worst case analysis at the lease sale stage of a 100,000 barrel oil spill if that were the only time the Secretary could review the potential environmental impacts of those leases and their possible exploration and development and production. As our earlier discussion of OCSLA's three stage process made clear, however, NEPA may require an environmental impact statement at each stage: leasing, exploration, and production and development. Furthermore, each stage remains separate. The completion of one stage does not entitle a lessee to begin the next. *See Secretary of the Interior v. California,* — U.S. at —, 104 S.Ct. at 671. A failure to consider at the lease sale stage a worst case analysis of an oil spill of 100,000 barrels does not foreclose consideration of such an analysis at later stages, and does not foreclose disapproval of lessee activity at those stages based on that analysis. Unlike *Sierra Club v. Sigler,* 695 F.2d at 963, where the approval of construction permits for a tanker port—equivalent to approval of development and production plans for an oil lease—presented the last opportunity for the government to act responsibly on a worst case analysis of a major oil spill, Lease Sale 70 does not commit the chief resources of the participants or agency. Under these circumstances, we agree with the Fifth Circuit's statement that "the unavailability of information, even if it hinders NEPA's 'full disclosure' requirement, should not be permitted to halt all government action .... This is particularly true when information may become available at a later time and can still be used to influence the agency's decision." *Id.* at 970. Given the adequate analysis of an over 10,000 barrel oil spill already contained in the Final Statement, these factors alone might answer the question whether information about a 100,000 barrel spill was important at the lease sale stage.

The Village argues, however, that the relative difficulties in cancelling or suspending a lease, or disapproving an exploration or development and production plan after the lease sale stage, make the information from a 100,000 barrel worst case analysis important at this initial stage. Viewed out of context, some of the statutory terms for suspension or cancellation of a lease seem to specify conditions more specific than the discretion the Secretary might have to grant a lease. *See, e.g.,* 43 U.S.C. § 1334(a)(1)(B) ("threat of serious, irreparable or immediate harm or damage to ... the ... environment" justifies suspension). These statutory terms are not exclusive, however. *See* 43 U.S.C.

§ 1334(a) (suspension regulations "shall include, but not be limited to," the statutory examples). The Secretary, in 30 C.F.R. § 250.12(a)(1)(iv) (1982), recaptures the full measure of his discretion under NEPA: "the Director [of the Minerals Management Service] may suspend ... any ... activity ... for any ... purpose necessary for the implementation of the National Environmental Policy Act." This correspondingly broadens the ability of the Secretary to continue a suspension. *See* 30 C.F.R. § 250.12(d)(3) (1982). It also relaxes the constraints on cancellation: after five continuous years of suspension the Secretary may cancel for environmental reasons. *See* 30 C.F.R. § 250.12(d)(5) (1982). The Secretary may also cancel anytime after the submitting of a development and production plan if the lessee breaches a conservation regulation or condition imposed by the Secretary. *See, e.g.,* 30 C.F.R. § 250.12(f)(3) (1982). Of course, some restraints on cancellation remain. *See, e.g.,* 30 C.F.R. § 250.12(d)(4) (1982). In the similar situation of plan disapprovals the Secretary retains even more discretion. Even if he has not prescribed regulations essentially prohibiting the objectionable features of the plan, *cf.* 43 U.S.C. § 1351(h)(1)(A) (allowing disapproval for failure to show compliance with regulations promulgated by the Secretary), he may disapprove the plan if he finds exceptional environmental circumstances. *See, e.g.,* 43 U.S.C. § 1351(h)(1)(D). Furthermore, the Secretary has full discretion to order modification of the plan for consistency with "[e]nvironmental, safety, and health requirements," *e.g.,* his discretion under ·NEPA, *see* 30 C.F.R. § 250.34–2(f), (g)(1)(v) (1982). The Secretary may cancel a lease for failure to comply with these plans over which he retains so large a discretion. *See* 43 U.S.C. § 1351(j). Such cancellation does not entitle the lessee to any compensation. *Id.*

We do not find these apparently minor alterations of the Secretary's discretion between the initial and subsequent stages sufficient, by themselves, to make missing information about a 100,000 barrel oil spill important at the lease sale stage. A 100,-000 barrel spill could only occur at a later stage, and the Secretary has already made an adequate analysis of an over 10,000 barrel spill. The CEQ's tiering regulations recommend a broad "environmental impact statement on a specific action at an early stage (such as ... site selection)" and then later analysis by supplement or subsequent statement when such tiering "helps the ... agency to focus on the issues which are ripe for decision and exclude from consideration issues ... not yet ripe." 40 C.F.R. § 1508.28(b) (1982). This indicates that minor changes in the Secretary's discretion because of a project's momentum do not bar consideration of environmental information in stages. The discrete stages of the OCSLA process suggest the same thing. Indeed, "the purchase of a lease entails no right to proceed with full exploration, development, or production." *Secretary of the Interior v. California,* — U.S. at ——, 104 S.Ct. at 670.

The Village asserts another objection, however: "the court assumed that EISs for exploration and development production would be forthcoming .... this is far from certain." The Secretary has represented, however, that he "fully intends to prepare a production and development EIS for the St. George Basin in accordance with the mandate of 43 U.S.C. § 1351(e)(1)." The Village counters that even if the Secretary does prepare an impact statement for development and production, he need only prepare it for one site plan, and might choose one development and production site that would not require a worst case analysis of a 100,000 barrel oil spill, while another site might require this information. The statute states: "At least once the Secretary shall declare the approval of a development and production plan in any area ..., to be a major Federal action," and thus trigger NEPA. 43 U.S.C. § 1351(e)(1). As the legislative history of OCSLA indicates, however, this mandatory NEPA study of a development and production plan "does not in any way limit the applicability of NEPA to later approval of later plans." H.R.Rep.

No. 95–590, 95th Cong., 2d Sess. 166–67, *reprinted in* 1978 U.S.Code Cong. & Ad. News 1450, 1572. If a development and production plan is the type that would, if NEPA applied, ordinarily require a worst case analysis of a large oil spill, it is difficult to imagine that the approval of the plan would not be major federal action. Indeed, the intervenors would go further; they believe the approval of exploration plans also triggers NEPA. *See Village of False Pass v. Watt,* 565 F.Supp. at 1163 n. 29. Furthermore, we have recently held that the CEQ's worst case regulation may apply to environmental assessments that do not require a full environmental impact statement under NEPA. *See Southern Oregon Citizens Against Toxic Sprays, Inc. v. Clark,* 720 F.2d 1475, 1480–81 (9th Cir.1983).

Thus, the Village's argument that later review is unlikely also fails. It cannot make the difference in information between the Secretary's adequate 10,000 barrel spill analysis and a hypothetical 100,000 barrel spill "important" to the lease sale decision. Further information about the probability and location of a 100,000 barrel spill will become available as lessees survey their tracts, or test them, or plan for production and development. The lease sale itself does not directly mandate further activity that would raise an oil spill problem, *see Secretary of the Interior v. California,* —— U.S. at ——, ——, 104 S.Ct. at 670, 671, but it does require an overview of those future possibilities. The over 10,000 barrel analysis in the Final Statement provides that overview in the circumstances of this case. Discounting the marginal improvement of information covered in a 100,000 barrel worst case analysis by the current uncertainty at the lease sale stage of such a spill, the Secretary did not abuse his discretion in delaying further consideration of whether the missing information will become important until a later stage.

Other courts have followed the general principle that staged development encourages staged consideration of uncertain environmental factors. *See, e.g., County of*

*Suffolk v. Secretary of the Interior,* 562 F.2d 1368, 1378 (2d Cir.1977) ("where a multistage project can be modified or changed in the future to minimize or eliminate environmental hazards disclosed as the result of information that will not be available until the future, and the Government reserves the power to make such a ... change after the information is ... incorporated in a further EIS, it cannot be said that deferment violates the 'rule of reason.' "), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978); *Sierra Club v. Morton,* 510 F.2d 813, 828 (5th Cir.1975) ("Because [the sale involved] ... contemplates numerous, successive lessor-lessee relationships involving activities over many areas and many years, the agency's continuing opportunity for making informed adjustments has a major effect upon our evaluation of the ... EIS ...."). The Supreme Court has approved this general principle under OCSLA. *See Secretary of the Interior v. California,* —— U.S. at ——, ——, 104 S.Ct. at 670, 671. Against this background, we find the Secretary did not abuse his discretion in considering information about a 100,000 barrel oil spill not important to his lease sale decision, given his adequate analysis of the impacts of an over 10,000 barrel spill on the entire St. George Basin environment and the improved information that will be available in later stages of the OCSLA process when, at least once, he will prepare another environmental impact statement under NEPA covering similar issues.

## V

As the Court of Appeals for the District of Columbia observed several years ago, *"the lease sale itself is only a preliminary and relatively self-contained stage within an overall oil and gas development program which requires substantive approval and review prior to implementation of each of the major stages: leasing, exploring, and producing."* *North Slope Borough v. Andrus,* 642 F.2d 589, 593 (D.C.Cir.1980) (emphasis in original). The Supreme Court has recently reinforced

this principle in *Secretary of the Interior v. California,* — U.S. ——, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984). Within the staged structure of the OCSLA and on the facts of this case, we hold the Secretary did not abuse his discretion in insuring his lease sale decision would not jeopardize endangered whales under the ESA. Within the staged structure of OCSLA and on the facts of this case, we hold the Secretary took the required "hard look" under NEPA at environmental consequences of his lease sale decision in the Lease Sale 70 Final Statement, as supplemented by the Supplemental Statement, without including a worst case analysis of a 100,000 barrel oil spill. On the basis of the Secretary's apparent compliance with the terms of the district court's order to prepare a Supplemental Statement and reconsider his lease sale decision, we hold we need not reach the question whether NEPA required imposition of that order.

AFFIRMED.

CANBY, Circuit Judge, concurring in part and dissenting in part:

I concur in parts I, II and III of Judge Wallace's thoughtful and well-crafted opinion. I respectfully dissent from part IV, however, because I believe that a "worst case" analysis of a major oil spill is necessary at the lease sale stage under NEPA and its relevant implementing regulation, 40 C.F.R. § 1502.22 (1982).

The prime purpose of NEPA in requiring Environmental Impact Statements is to assure that federal decision-makers consider the environmental consequences of their major actions before the decision to act is made. *See Kleppe v. Sierra Club,* 427 U.S. 390, 409, 96 S.Ct. 2718, 2729, 49 L.Ed.2d 576 (1976); Conference Report on NEPA, 115 Cong.Rec. 40416 (1969). Where some of the consequences are unknown, as they unquestionably are here, and are important to the decision,[1] the Council on Environmental Quality has required that the worst possible consequences be assessed. 40 C.F.R. § 1502.22 (1982). The regulation is thus designed to assure what common sense would in any event dictate: that a decision-maker be given the opportunity to decide against taking action when the benefits to be gained, although substantial, are outweighed by the risk, although small, of a truly catastrophic environmental impact. The weighing and balancing of gains against risks is, of course, the province of the decision-maker. But the decision-maker must be informed of the extent of a possible catastrophe, a worst case, at a time when he or she is free to make an unfettered decision to refrain from an action because the slight risk of immense harm overshadows the potential benefits. I am satisfied that in the present case, that moment occurs no later than the lease sale stage, before sale and execution of any leases.

Prior to sale, the Secretary has absolute discretion to decline to lease an OCS tract. *See* 43 U.S.C. § 1344(a). He can therefore decline to lease on the ground that exploration or development will run a small but real risk of immense environmental harm. Once the Secretary leases a tract, however, he loses that freedom, and consequently commits himself to incur such a risk. The reasons why the Secretary loses his freedom upon sale of the leases are both legal and practical.

As a legal matter, the Secretary is allowed to cancel an existing lease for envi-

---

**1.** Like the majority, I view the determinative issue to be whether the information relevant to adverse impacts is "important to the decision" within the meaning of 40 C.F.R. § 1502.22(b) because that is the way all parties have framed this appeal. Unlike the majority, however, I would adhere to the ruling of *Save Our Ecosystems v. Clark,* Nos. 83–3908, 3918, 3887 & 3916, (9th Cir. Jan. 27, 1984), that no rational distinction can be made, and none was intended, between the standards of "important to the decision" and "essential to the decision" when the distinction purports to be based on the reason why information is unavailable. *Save our Ecosystems* blended both standards into one of significance: "If significant information cannot be produced because the costs are exorbitant or the methods beyond the state of the art, a [worst case analysis] must be prepared." *Id.*

ronmental reasons only if he determines that:

> (i) continued activity ... *would probably cause* serious harm or damage to ... [the] environment; (ii) the threat of harm or damage will not disappear or decrease to an acceptable extent within a reasonable period of time; and (iii) the advantages of cancellation outweigh the advantages of continuing such lease or permit in force.

43 U.S.C. § 1334(a)(2)(A) (emphasis added); 43 U.S.C. § 1351(h)(1)(D). The requirement of a determination that continued activity "would *probably* cause serious harm to the environment" is a forceful restriction on the Secretary's authority. At least under ordinary circumstances, it prohibits cancellation because of the possibility of a major oil spill; as we observed in *Southern Oregon Citizens Against Toxic Sprays v. Clark*, 720 F.2d 1475, 1479 (9th Cir.1983), a major oil spill is not a *probable* occurrence, but rather is "an event of low probability but catastrophic effects." The effect of the statute, therefore, is that sale of the leases ends the Secretary's right to call a total halt to exploration and development out of concern over remote environmental catastrophes.[2]

The majority opinion views the restrictions on the Secretary's discretion after leasing as only "minor alterations," because the statute is not exclusive and the Secretary may by regulation expand his power to suspend or cancel leases. I cannot agree. It is true that the Secretary's power to *suspend* operations remains broad, but we have held that the power to suspend is exceeded when the suspension is so open-ended as to amount to a cancellation of a lease. *Union Oil Co. of California v. Morton*, 512 F.2d 743, 750–51 (9th Cir.1975). Suspension is therefore a temporary remedy and, being temporary, cannot eliminate the possibility of a major oil spill. Only cancellation can do that.

Perhaps the majority opinion is correct in stating that the Secretary by regulation could expand his powers of cancellation, but the proposition is by no means self-evident. In *Union Oil Co. of California*, 512 F.2d at 750, we held that the Secretary's statutory authority to "prescribe ... such ... regulations as he determines to be necessary and proper ... for the conservation of the natural resources of the outer Continental Shelf," 43 U.S.C. § 1334(a), did not authorize him to issue a regulation effectively cancelling a lease. In 1978, three years after the decision in *Union Oil*, Congress amended OCSLA to expand the power of the Secretary to cancel a lease or disapprove exploration or development plans, but the House Report stated that "the Secretary is given authority to disapprove a plan, *but only for [the] specified reasons*." H.R.Rep. No. 95–590, 95th Cong., 2d Sess. 168 (emphasis added), *reprinted* in 1978 U.S.Code Cong. & Ad. News 1450, 1574. In any event, the Secretary has not regulated to expand his powers of cancellation; the present regulation tracks the language of 43 U.S.C. § 1334(a)(2)(A) and permits cancellation only when continued activity under the lease "would probably cause serious harm or damage ... to the ... environment." 30 C.F.R. § 250.12(d)(4)(i). The identical language appears in the statute and regulation requiring the Secretary to disapprove development plans because of exceptional environmental circumstances. 43 U.S.C. § 1351(h)(1)(D); 30 C.F.R. § 250.34–2(g)(2)(iii)(C) (1982). Our decision should be based on the constraints in existing regulations, which now bind the Secretary. *See California v. Block*, 690 F.2d 753, 762–63 (9th Cir.1982) (EIS required at first stage of multi-stage project where regulation commits agency to action at later stage).

---

**2.** The First Circuit has held that the 1978 Amendments to OCSLA did not restrict the Secretary's powers under the ESA. *Conservation Law Foundation of New England, Inc. v. Andrus*, 623 F.2d 712, 714–15 (1st Cir.1979). That holding may expand the Secretary's powers to cancel exploration and development out of concern over the potential impacts on endangered species; the holding, however, does not increase the Secretary's powers to protect other environmental resources from remote but catastrophic risks.

Even if the majority is correct in concluding that the Secretary is not *legally* committed upon the sale of leases to a program of exploration and development, the Secretary is committed "as a practical matter." *See California v. Block,* 690 F.2d at 761. Once the leases are sold, immense amounts of money change hands, expensive exploration projects are undertaken, and the Department of Interior and various state agencies plan for the consequences of the lease program. As the First Circuit has stated, "[e]ach of these events represents a link in a chain of bureaucratic commitment that will become progressively harder to undo the longer it continues." *Massachusetts v. Watt,* 716 F.2d 946, 952 (1st Cir. 1983). Moreover, cancellation of a lease may require the payment of very substantial compensation to the lessee. 43 U.S.C. § 1334(a)(2)(C). That possibility is bound to be a significant deterrent to cancellation. The combined impact of all of these factors renders the lease sale a practical commitment by the Secretary to a program of exploration and, if oil or gas is discovered, to production. It is therefore at the lease sale stage that the Secretary [3] needs to know the worst environmental consequences that may result from that program.

My conclusion that the worst case analysis of a major oil spill must be considered at the lease sale stage is not inconsistent with the phased nature of OCS development. The possibility of a major oil spill cannot be eliminated merely by later-stage regulation of exploration and development; it can only be eliminated by a total refusal to permit exploration and development. The Secretary's power to refuse, and thus to avoid the risk of an oil spill, is curtailed after leases are sold. It is therefore "important" to study the worst case effects of a major spill at the lease sale stage.[4]

My conclusion is also unaffected by *Secretary of the Interior v. California,* — U.S. —, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984). That case held that nothing that occurs at the OCSLA lease sale stage "directly affects" the coastal zone so as to require a review to determine whether the leases are consistent with the state's management plan adopted pursuant to the Coastal Zone Management Act (CZMA), 16 U.S.C. §§ 1451–64 (1982). Two points distinguish that case from ours. First, as the Supreme Court in *Secretary v. California* repeatedly emphasized, a state's power under CZMA is just as great, and as fully exercisable, at the exploration and production stages of offshore development as it is at the lease sale stage. E.g., — U.S. at —, 104 S.Ct. at 671 ("OCSLA expressly provides for federal disapproval of [an exploration] plan that is not consistent with an applicable state management plan.... 43 U.S.C. § 1340(c)(2)."); *id.* ("The State can veto [the development and production] plan as 'inconsistent' [with its coastal management program].... 43 U.S.C. § 1351(d)."). Therefore, entering a lease has little import from a CZMA perspective. It has great import from a NEPA perspective, as I have explained. Second, the Supreme Court's opinion in *Secretary v. California* rested in large part on "the lengthy, detailed, and coordinated provisions of CZMA § 307(c)(3)(B), and OCSLA §§ 1344–1346 and 1351." — U.S. at —, 104 S.Ct. at 672. The detailed coordination was a principal support for the court's conclusion that Congress intended to postpone consistency review to the later stages specified by the cross-referenced statutory provisions. *Id.* There is no such comprehensive cross-referencing between NEPA and OCSLA to suggest an intent by Congress to confine NEPA review to late stages. Indeed, the parties here concede NEPA's application to lease sales, and the Supreme Court in *Sec-*

---

**3.** The public also needs to know, for informed public participation, like informed decision-making, is a purpose of NEPA. *See Save Lake Washington v. Frank,* 641 F.2d 1330, 1334 (9th Cir.1981).

**4.** There are many environmental risks other than those of an oil spill that can be eliminated through regulation at the exploration or production stage. I agree with the majority that the phased nature of OCS development makes it unnecessary to study those risks in a worst case analysis at the leasing stage.

*retary v. California* introduced its description of lease sales with the statement that "[r]equirements of the National Environmental Protection Act and the Endangered Species Act must be met first." —— U.S. at ——, 104 S.Ct. at 670.

I would therefore hold the unknown consequences of a major oil spill to be "important" to the lease sale decision within the meaning of 40 C.F.R. § 1502.22(b) (1982), and would require the EIS to include a worst case analysis of its consequences. Once the leases are sold, the risk of such a spill has been taken.