**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 29 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

BIODIVERSITY LEGAL
FOUNDATION and MARIE ELLEN
MORRISSEY,

      Plaintiffs-Appellants,

v.

BRUCE BABBITT, in his official
capacity as Secretary of the Interior; and
MOLLIE BEATTIE, in her official
capacity as Director of the United States
Fish and Wildlife Service,

      Defendants-Appellees.

No. 97-1131

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 95-S-2575)**

---

Neal Levine of Earthlaw, Denver, Colorado for Plaintiffs-Appellants.

James C. Kilbourne (James F. Simon, Henry L. Solano, and Stephen D. Taylor of the Office of the United States Attorney, and M. Alice Thurston and Mark A. Brown with him on the brief), Department of Justice, Washington, D.C., for Defendants-Appellees.

---

Before **KELLY** and **HENRY**, Circuit Judges, and **BRETT**, Senior District Judge.[1]

---

[1]The Honorable Thomas R. Brett, Senior District Judge for the Northern District of Oklahoma, sitting by designation.

**KELLY**, Circuit Judge.

Plaintiffs-Appellants Marie Morrissey and the Biodiversity Legal Fund (collectively "Biodiversity") appeal from the district court's grant of summary judgment in favor of defendants-appellees Bruce Babbitt, Mollie Beattie, and the Fish and Wildlife Service (collectively "the Service"). The district court held that the Service's failure to make a preliminary 90-day finding on the petition to list the Columbian sharp-tail grouse and its reliance upon the 1997 Listing Priority Guidance (1997 LPG) to guide the Service's allocation of resources in meeting its listing obligations did not violate section 4(b)(3)(A) of the Endangered Species Act (ESA), 16 U.S.C. § 1533(b)(3)(A). Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm.

## Background

The facts of this case are undisputed. On March 14, 1995, Biodiversity filed a petition with the Service to list the Columbian sharp-tailed grouse as an endangered species. The Service began to review the petition upon receipt, but on April 10, 1995, Congress passed a rider to an appropriations bill rescinding $ 1.5 million from the Service's 1995 listing budget and prohibiting the Service from spending previously appropriated funds on final listings. See Emergency Supplemental Appropriations and Rescissions for the Department of Defense to Preserve and Enhance Military Readiness

2

Act of 1995, Pub. L. No. 104-06, 109 Stat. 73, 86 (1995).[2]  Funding for the Service's

1996 listing program was similarly limited by a number of resolutions which continued

the funding moratorium on final listing and critical habitat determinations.  See 61 Fed.

Reg. 24723 (describing effect of continuing resolutions on listing program).  According

to § 4(b)(3)(A) of the Endangered Species Act, a preliminary finding on petitions to list

species must be made within 90 days "to the maximum extent practicable."  16 U.S.C. §

1533(b)(3)(A).  The Service continued to work sporadically on the grouse petition during

this time, but made no 90-day finding.

The moratorium was lifted at the end of fiscal year 1996.  See Omnibus

Consolidated Rescissions & Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat.

1321, 1321-159 (1996).  As a result of the funding shortage, however, the Service was

confronted with over 240 species upon which final listing action was pending, as well as

several petitions for assessment of conservation status, pending petitions to list species,

and court orders directing the Service to take action under section 4 of the ESA.  After

---

[2]The rider provided in pertinent part:

Of the funds made available [for the Department of Interior's fiscal year 1995]
(1) $1,500,000 are rescinded from the amounts available for making
determinations whether a species is a threatened or endangered species and whether
habitat is critical habitat under the Endangered Species Act . . .; and
(2) none of the remaining funds appropriated [for the Department of Interior's
fiscal year 1995] may be made available for making a final determination that a species is
threatened or endangered or that habitat constitutes critical habitat . . . .

109 Stat. at 86.

public notice and comment the Service adopted a set of guidelines to prioritize the use of funding remaining for fiscal year 1996. See 61 Fed. Reg. 64475-81 (Dec. 5, 1996). The 1997 Listing Priority Guidance (1997 LPG)[3] supplements the Service's 1983 guidelines, see 48 Fed. Reg. 43098-43105 (Sept. 21, 1983), which allocate listing appropriations based on species' taxonomic distinctions and the magnitude and immediacy of threat facing them. See id. at 43103-04. The 1997 LPG further prioritizes the allocation of funding based on the type of listing action undertaken by the Service. Funds are allocated to listing activities according to their relative placement in one of four tiers. Emergency listing actions and the processing of final decisions on proposed listings are placed in Tiers 1 and 2, receiving the highest priority for funding. See id. After a preliminary review of petitions to determine whether an emergency listing action is warranted, petitions to list, such as the grouse petition, are placed in Tier 3 along with issuance of new proposed listings for candidate species. See 61 Fed. Reg. at 64479-80. All other actions are placed in Tier 4 and given the lowest priority for funding. See id.

The Service allocates listing appropriations among its seven regional offices according to the percentage of total proposed and candidate species for which the region

---

[3]Although there is some confusion among the parties regarding the proper name of the regulations which are being challenged, it is clear from the briefs and the record both parties are referring to the Final LPG published at 61 Fed. Reg. 64475-81 (Dec. 5, 1996), which is the "Final Listing Priority Guidance for Fiscal Year 1997." For sake of clarity, we refer to these regulations as the 1997 LPG, though Biodiversity's briefs refer to them as the 1996 LPG.

4

is responsible. The region to which the grouse petition was assigned received the largest allocation of the remaining 1996 funds, but also had a backlog of 111 proposed species to list. The Service thus expected when it promulgated the 1997 LPG that it would not complete all Tier 2 activities given the limited funding provided during fiscal year 1996 and that no Tier 3 activities would be undertaken.

After issuing a notice of intent to sue, Biodiversity filed suit on October 10, 1995, seeking injunctive and declaratory relief under the ESA and the Administrative Procedures Act (APA), see 5 U.S.C. §§ 701-706, to enforce the 90-day finding deadline on the grouse petition. The parties filed cross-motions for summary judgment, and upon review the district court adopted the magistrate's recommendation to deny Biodiversity's motion and grant the Service's cross-motion. See Aplt. App. at 6. Specifically, the district court determined that the Service had adequately demonstrated impracticability due to the funding moratorium, and that the Service accordingly acted within its statutory discretion in promulgating the 1997 LPG. See Aplt. App. at 5-6.

The 1997 LPG remains in effect until the Final LPG for fiscal year 1998 is published. See 62 Fed. Reg. 55268-69 (Oct. 23, 1997); 63 Fed. Reg. 10931 (Mar. 5, 1998). To date, no 90-day finding has been issued on the grouse petition, and it is undisputed that the Service could make such a finding within 2 to 3 weeks at a cost of approximately $4,000 to $7,000. See Aplt. App. at 23. According to the Service, it has failed to make a 90-day finding on the grouse petition due to inadequate funding. See

Aplt. App. at 32.

Discussion

We review the district court's grant of summary judgment de novo, applying the same summary judgment standard used by the district court. See Fed. R. Civ. P. 56(c); Rohrbaugh v. Celotex Corp., 53 F.3d 1181, 1182 (10th Cir. 1995). Where, as here, the facts are largely undisputed, our duty is simply to discern whether the moving party -- here, the Service -- is entitled to judgment as a matter of law. See id. Accordingly, in examining whether the Service's actions violate the ESA, we rely on the standards of review provided in the APA. See Sierra Club v. Glickman, 67 F.3d 90, 96 (5th Cir. 1995); Village of False Pass v. Clark, 733 F.2d 605, 609 (9th Cir. 1984). Biodiversity is entitled to relief if the Service's failure to make a 90-day finding on the grouse petition constitutes "agency action unlawfully withheld." See 5 U.S.C. § 706(1); Mt. Emmons Mining Co. v. Babbitt, 117 F.3d 1167, 1170 (10th Cir. 1997); Carpet, Linoleum & Resilient Tile Layers Local Union No. 419 v. Brown, 656 F.2d 564, 566-67 (10th Cir. 1981) ("[S]ection 706(1) is a source of injunctive relief to remedy an arbitrary or capricious delay or denial of agency action."). Under the APA, administrative decisions involving the ESA are upheld unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see Village of False Pass, 733 F.2d at 609-10, or if they are "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(C).

6

Although not explicitly stated in its brief, Biodiversity appears to challenge the validity of the 1997 LPG in that it directly conflicts with or is an unreasonable interpretation of section 4 of the ESA. Thus, our review of the district court's grant of summary judgment in favor of the Service focuses on whether the Service's promulgation of, and reliance on, the 1997 LPG are in violation of section 4 of the ESA, 16 U.S.C. § 1533(b)(3)(A), and whether the Service's resulting failure to make a 90-day finding on the grouse petition is agency action unlawfully withheld.

At the outset, we construe Biodiversity's argument that the 1997 LPG "finds absolutely no support in the ESA" as a challenge to the Service's statutory authority to promulgate the 1997 LPG. See Reply Brief at 3-4; Aplt. Brief at 17-19. Section 4(h) of the ESA, however, allows the Service to promulgate "agency guidelines to insure the purposes of [section 4] are achieved efficiently and effectively," including "ranking system[s] to assist in the identification of species that should receive priority review . . . ." 16 U.S.C. § 1533(h). Though Biodiversity argues this section only allows prioritization of species "based on the magnitude and immediacy of the threat to the species," Reply Brief at 4, the plain language of section 4(h)(3) indicates the Service has the authority to promulgate any regulations which may "assist in the identification of species that should receive priority review," as long as such regulations effectively achieve the purposes of section 4. 16 U.S.C. § 1533(h)(3). Thus, section 4(h)(3) provides the Service with the authority to promulgate the 1997 LPG, and to the extent Biodiversity's argument

7

challenges that authority, we reject it.

Biodiversity's chief complaint, as we read the briefs, is that the 1997 LPG, which funds actions for final listing of pending petitions to list before funding non-emergency petitions to list, is invalid because it conflicts with the statutory requirements of the ESA, specifically section 4(b)(3)(A). It provides:

> [t]o the maximum extent practicable, within 90 days after receiving the petition of an interested person . . . to add a species to [the endangered or threatened species list], the Secretary shall make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted . . . . The Secretary shall promptly publish each finding made under this subparagraph in the Federal Register.

16 U.S.C. § 1533(b)(3)(A). The Service and Biodiversity both appear to agree that the "maximum extent practicable" language contained in section 4(b)(3)(A) provides an exception to what would otherwise be a mandatory requirement. See Aplt. Brief at 1; Aple. Brief at 28-29. Further, both parties agree that this language limits the agency's discretion, requiring the Service to make 90-day findings where practicable. See Aplt. Brief at 14-15; Aple. Brief at 28-29.

Beyond this, however, the parties' positions diverge. Biodiversity asserts that the "maximum extent practicable" language clearly limits the Service's discretion to refrain from acting on a petition to list only if the Service can establish it is impracticable to act on that particular petition to list. See Aplt. Brief at 11-16. Accordingly, Biodiversity claims that the 1997 LPG, which ranks findings on petitions to list below emergency and final listings based on the Service's need to allocate limited resources, exceeds the

8

Service's statutory authority or, alternatively, is an unreasonable interpretation of section 4. See Aplt. Brief at 16-21. Conversely, the Service argues Congress envisioned a broader meaning of impracticability in section 4(b)(3)(A), encompassing limitations placed on the Service by budgetary shortfalls such as the one imposed by the funding moratoria. See Aple. Brief at 29-33. Thus, the Service considers the 1997 LPG a reasonable and prudent exercise of the discretion Congress provided in section 4 to implement the Act generally and section 4 specifically.

At the outset, we note "Congress delegated broad administrative and interpretive powers to the Secretary" when it enacted the ESA. See Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, 115 S. Ct. 2407, 2418 (1995) (citing 16 U.S.C. §§ 1533, 1540(f)). Although the Service "must give effect to the unambiguously expressed intent of Congress," courts must defer to the Service's interpretation of the ESA if Congressional intent is ambiguous or nonexistent and the Service's construction of the statute is a permissible one. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984). A challenge to an agency construction of a statutory provision must fail if, in light of Congress's ambiguity or silence, the agency's action "is a reasonable choice." Id. at 866.

We first determine whether Congress has given specific meaning to section 4(b)(3)(A)'s requirement that petitions to list be acted on within 90 days "to the maximum extent practicable." See id. at 842-43. In light of the statutory language and

Biodiversity's previous concession, we reject any suggestion that section 4(b)(3)(A) imposes a mandatory, nondiscretionary duty on the Service to act on new petitions to list within 90 days. See Aplt. Brief at 11-12, 19-21; Reply Brief at 2. Though Congress' 1982 amendments to the ESA were enacted to force the Service to act more quickly on petitions to list, see H.R. Conf. Rep. No. 97-835, reprinted in 1982 U.S.C.C.A.N. 2860, 2861-62, the language of section 4(b)(3)(a), which Biodiversity admits provides at least a "limited exception" to the 90-day time limit, controls. See Aplt. Brief at 12; Robinson v. Shell Oil Co., 70 F.3d 325, 328 (4th Cir. 1995) ("Courts are charged with the duty to apply the law that Congress enacted.").

We look first to the statute to determine the exception's scope. Since Congress did not define or otherwise explain the meaning of the facially ambiguous phrase "maximum extent practicable" within the statute, we assume Congress intended the words to be given their ordinary meaning, which we may discover through the use of dictionaries. See United States v. LaBonte, 117 S. Ct. 1673, 1677 (1997). "Practicable is . . . that which is performable, feasible, [or] possible. . . ." Black's Law Dictionary 1172 (6th ed. 1991); see also Webster's Ninth New Collegiate Dictionary 923 (defining "practicable" as that which is "possible to practice or perform: feasible"). "Maximum" is defined as "the highest or greatest amount, quality, value or degree." Black's Law Dictionary at 979; see also Webster's Ninth New Collegiate Dictionary at 735 (defining "maximum" as "the greatest quantity or value attainable"). Based on these definitions, the phrase "to the

10

maximum extent practicable" "imposes a clear duty on the agency to fulfill the statutory command to the extent that it is feasible or possible." Fund for Animals v. Babbitt, 903 F. Supp. 96, 107 (D.D.C. 1995) (construing same language in another subsection of the ESA).

Though the ordinary language of the statute speaks in general terms of the greatest extent feasible or possible, the phrase remains ambiguous because neither the statutory language nor its ordinary meaning specifies the circumstances under which the Service may forego the 90-day deadline. Thus, we turn to legislative history to divine Congress' intent to control the Service's discretion, if any such intent exists. See Chevron, 467 U.S. at 851-53. Both parties argue that the following discussion of the practicability language of section 4(b)(3)(A) contained in a House Conference Report supports their construction of the statute:

> The phrase "to the maximum extent practicable" addresses the concerns that a large influx of petitions coupled with an absolute requirement to act within 90 days would force the devotion of staff resources to petitions and deprive the Secretary of the use of those resources to list a species that might be in greater need of protection. The phrase is not intended to allow the Secretary to delay commencing the rulemaking process for any reason other than that the existence of pending and imminent proposals to list species subject to a greater degree of threat would make allocation of resources to such a petition unwise. The listing agencies should utilize a scientifically based priority system to list and delist species, subspecies and populations based on the degree of threat, and proceed in an efficient and timely manner.

H. Conf. Rep. No. 97-835, at 21 (1982), reproduced in 1982 U.S.C.C.A.N. 2807, 2860-62 (emphasis added). Biodiversity argues this passage indicates that only actions pertaining

11

to "species subject to a greater degree of threat" may excuse noncompliance with the 90-day finding deadline, and that the Service must accordingly make an individualized showing that the species in Tier 2 awaiting final listings are more imperilled than the grouse. See Aplt. Brief at 13-14. Conversely, the Service argues the passage's references to the allocation of resources to species most in need supports a broader reading of the statutory language, allowing the Service to prioritize its actions according to biological need when funding and manpower are limited. See Aple. Brief at 30.

It is telling that both parties rely on the same passage to support such widely divergent meanings of the statute, and we decline to choose between them, as we believe the only thing clear about the statutory provision before us is its ambiguity. Although there is "no errorless test" for recognizing ambiguity, see United States v. Turkette, 452 U.S. 576, 580 (1981), where the legislative history of an admittedly ambiguous statutory provision "is scant and capable of differing interpretations" we are not inclined to impart meaning where Congress fails to do so itself. See Miller v. Commissioner, 836 F.2d 1274, 1282 (10th Cir. 1988). Even if the legislative history were clear, we are not convinced "Congress has . . . directly addressed the precise question at issue." Chevron, 467 U.S. at 843. The legislative history nowhere suggests Congress explicitly considered the effect of a budgetary shortfall; rather, Congress' concern was that "a large influx of petitions" might divert resources from other, more pressing listing activities if the deadline for 90-day substantial findings was mandatory. 1982 U.S.C.C.A.N. at 2862.

12

We are not inclined to expand Congress' specific concerns relating to the Service's workload to encompass budgetary shortfalls which were not envisioned by Congress when it enacted the statutory provision. Finally, even if the legislative history means what Biodiversity says it means, we cannot square such a narrow reading with the broad language Congress employs in the statute. To so limit the operation of section 4(b)(3)(A) would require "unequivocal evidence" of such intent, which this slender reed of legislative history does not provide. See Miller, 836 F.2d at 1284-85. Thus, the question whether the Service may excuse its compliance with the 90-day finding provision because of limited funding is a gap left by Congress which the Service may fill, and we will disturb the Service's interpretation only if it is inconsistent with the statute. See Chevron, 467 U.S. at 842.

To the extent this snippet of legislative history illuminates the statutory language, then, it only helps us to determine whether the Service's interpretation of section 4(b)(3)(A) contained in the 1997 LPG is a reasonable one, in light of the statutory language, legislative history, and legislative purpose. See generally Chevron, 467 U.S. at 842-43; INS v. Cardoza-Fonseca, 480 U.S. 421, 443-450 (1987). We previously noted that the statutory language provides the Service with discretion to defer making a 90-day finding on an initial petition to list, but limits the Service's discretion only in terms of feasibility or possibility. The scant legislative history supplements section 4(b)(3)(A)'s language only to note that the Service may delay the commencement of rulemaking if it

13

determines "the existence of pending and imminent proposals to list species subject to a greater degree of threat would make allocation of resources to such a petition unwise." 1982 U.S.C.C.A.N. at 2862. Notwithstanding Biodiversity's assertions to the contrary, the legislative history nowhere intimates that the Service's prioritization or allocation of resources to "species subject to a greater degree of threat" must be made on an individualized, species by species basis, nor do the authorities cited by Biodiversity support such a restricted reading of section 4(b)(3)(a). See Marbled Murrelet v. Babbitt, 918 F. Supp 318, 322 (W.D. Wash. 1996) (interpreting provision of Pub. L. No. 104-6 requiring compliance with court orders issued under ESA unless "making of the determination is made impracticable" by rescission of funding in preceding sentence); BLF v. Babbitt, CA 96-1156-JLG (D.D.C. Mar. 27, 1997) (relying on Marbled Murrelet and failing to analyze section 4(b)(3)(A)).

The 1997 LPG's prioritization of final listing activities above processing initial petitions to list is consistent with the language and legislative history of section 4(b)(3)(A) and the broader purpose of the ESA. Both the language and legislative history of section 4(b)(3)(A) reflect Congress's recognition that the Service must retain the ability to order and prioritize its work, particularly when provided limited resources, in order to adequately fulfill its mission. By enacting the ESA and entrusting its administration to the Service, Congress recognized that "the task of defining and listing endangered and threatened species requires an expertise and attention to detail that

14

exceeds the normal province of Congress." Sweet Home Chapter, 115 S. Ct. at 2418. With the limited proviso that the Service "utilize a scientifically based priority system to list and delist species, subspecies and populations based on the degree of threat," 1982 U.S.C.C.A.N. at 2862; see 16 U.S.C. § 1533(b)(1)(A), Congress left to the Service the difficult task of ordering the Service's work to both fulfill the purpose of the ESA and comply with the statute's non-discretionary mandates. See, e.g., 16 U.S.C. § 1533(b)(3)(B) (requiring finding that a petitioned action is warranted, warranted but precluded, or not warranted "[w]ithin 12 months after receiving a petition that is found . . . to present substantial information indicating that the petitioned action may be warranted . . . ."); 16 U.S.C. § 1533(b)(6)(A) (requiring final determination of endangered or threatened status or critical habitat "[w]ithin the one-year period beginning on the date on which general notice is published . . . regarding a proposed regulation" under § 1533(5)(A)(I)). By allowing the Service to act within statutory guidelines "to the maximum extent practicable" in limited circumstances, Congress implicitly recognized that at times mandatory listing actions would (and should) be given a higher priority than other listing actions. See, e.g., 16 U.S.C. §§ 1533(b)(3)(A), (b)(3)(D)(I). Thus, by inserting the "maximum extent practicable" language into section 4(b)(3)(A), Congress provided the Service the discretion to refrain from acting on initial petitions to list if it determined that "pending and imminent proposals to list species" in greater biological danger should be given greater priority. 1982 U.S.C.C.A.N. at 2862.

15

Just as important, Congress recognized the Service's actions do not take place in a vacuum. Agency actions are driven (and constrained) as much by agency funding as by agency policy and statutory directive. The legislative history of section 4(b)(3)(A) envisioned that at times funds might be diverted from the earliest stages of the listing process if the Service determines, considering listing actions already commenced and pending, that allocation of resources to such listing activities would be "unwise." 1982 U.S.C.C.A.N. at 2862. Notably, the wisdom of allocating resources to other "pending and imminent proposals to list" affecting species in greater biological danger is implicitly left within the sound discretion of the Secretary, and thus, the Service. See id.

Given Congress's substantial deference to the Service's prioritization of initial listing actions based on the relative degree of threat facing species for which the listing process has already been invoked and the wisdom of allocating resources to those species, the 1997 LPG is eminently reasonable. Though Biodiversity implies the 1997 LPG allocates funds primarily on the basis of the stage of listing action undertaken, see Aplt. Brief at 18-19, the 1997 LPG undeniably assesses biological risk as well. The Service notes in the 1997 LPG that "[t]he vast majority of the unresolved proposed species face high-magnitude threats," and that the 41 proposed species not facing imminent threat are included in multi-species packages with species facing imminent threat. 61 Fed. Reg. at 64478-79. Recognizing that "only listed species receive the full conservation benefits and substantive protections of the Act," 61 Fed. Reg. at 24722, 24725; see 16 U.S.C. §

16

1533(d), (f), the Service decided that handling emergency petitions and resolving the listing status of the large number of outstanding proposed listings created by the funding moratoria would be the most conservation-effective use of the limited funds available. See 61 Fed. Reg. at 64479. Also, the Service reasoned that deferring initiation of the rulemaking process would minimize the cost of issuing final listings, as the Service could act on those species while the data was still "fresh," and would minimize the backlog of proposed species awaiting final listing. See id. Finally, under the 1997 LPG, the Service conducts an initial screening of all petitions received, and if the Service determines emergency listing is warranted, the petition is elevated to Tier 1 status. See id. Thus, absent a petition to list which warrants emergency action, the 1997 LPG allows the Service to allocate its resources to pending petitions to list species which face high-magnitude threats, an action completely consistent with the language and intent of section 4(b)(3)(A).

We find unpersuasive Biodiversity's suggestion that the 1997 LPG's priority system supplants the mandatory statutory deadlines for listing actions contained in section 4(b) of the ESA. See, e.g., 16 U.S.C. § 1533(b)(3)(B), (C)(I). We note that the question of the 1997 LPG's validity where a violation of a mandatory provision of the ESA is alleged is not before us. Given the posture of the case, our review is limited to assessing whether the 1997 LPG is a reasonable interpretation of section 4(b)(3)(A) in light of the entire statutory scheme, including section 4(b)(3) generally.

17

The 1997 LPG nowhere expressly conflicts with any provision of section 4(b)(3). Nor is the 1997 LPG inconsistent with section 4(b)(3) generally; as we noted before, both section 4 of the ESA and the 1997 LPG give higher priority to final decisions on proposed listings than to 90-day findings on petitions to list. Similarly, as we held before, the 1997 LPG is entirely consistent with the language and legislative history of section 4(b)(3)(A), which is the only statutory "deadline" Biodiversity specifically asserts the Service has violated. See Aplt. Brief at 19-21. Through the 1997 LPG, the Service furthers the purpose of the ESA by allocating its limited resources to those species in the greatest danger of extinction to move those species closer to the greatest protection the ESA can provide -- "endangered" status. See 16 U.S.C. § 1532(6).

We recognize Biodiversity's concern that policies embodied in the 1997 LPG do not further the conservation interests of all species facing biological threat. Biodiversity's disagreement with the Service's policy choice is understandable, as is its obvious dissatisfaction with Congress's funding of conservation efforts under the ESA. As a reviewing court, however, our job is not to assess the wisdom of policy choices. See Chevron, 467 U.S. at 866. The agency's interpretation of section 4(b)(3)(A) being reasonable, Biodiversity's complaints are better addressed to Congress.

We thus hold that the Service's implementation of and adherence to the 1997 LPG are based on a reasonable construction of section 4(b)(3)(A), are entitled to deference, and support the district court's grant of summary judgment. We need not reach the

18

question of what relief is proper for violations of the ESA.

AFFIRMED.