EXXON MOBIL CORPORATION, f/k/a Exxon Corporation, a New Jersey corporation; and Tosco Corporation, Plaintiffs,

v.

Gale NORTON, Secretary of the United States Department of the Interior; The United States Department of the Interior; Thomas Fry, Acting Director of the Bureau of Land Management, United States Department of the Interior; and Ann Morgan, Director of the Colorado State Office of the Bureau of Land Management, Defendants.

Nos. CIV.A. 00–B–2524(PAC), 00–B–2536.

United States District Court, D. Colorado.

May 29, 2002.

James A. Clark, Baker & Hostetler, Denver, CO, for plaintiffs.

Peter J. Krumholz, United States Attorney's Office, Denver, CO, for defendants.

## MEMORANDUM, OPINION, AND ORDER

BABCOCK, Chief Judge.

Plaintiffs Exxon Mobil Corporation ("Exxon") and Tosco Corporation

("Tosco") seek reversal of the Interior Board of Land Appeals ("IBLA") decision dated September 5, 2000 and affirmance of Administrative Law Judge ("ALJ") Sweitzer's ruling regarding discovery dated January 9, 1998. The IBLA's decision affirmed ALJ Sweitzer's Order that Plaintiffs' oil shale claims were null and void for failure to perform the required assessment work and refused to rule on ALJ Sweitzer's decision regarding discovery. Defendants oppose the appeal. The parties' have submitted adequate briefs and have agreed that oral argument is not necessary. For the following reasons, I affirm the IBLA's decision and decline to rule on ALJ Sweitzer's decision regarding discovery. Jurisdiction is proper pursuant to 28 U.S.C. § 1331, 5 U.S.C. § 701.

### A. Background

Exxon has 20 unpatented shale oil mining claims and Tosco has 12 such claims located in Garfield County, Colorado, in the Piceance Creek Basin, which is underlain by the Green River Formation. All of these oil shale claims were located prior to February 25, 1920 by Plaintiffs' predecessors in interest. Exxon filed a patent application for its claims in January 1984, Tosco filed a patent application for its claims in June 1985.

Oil shale is defined as "a sedimentary rock containing organic material called kerogen which, upon destructive distillation, produces a substantial amount of oil." *Andrus v. Shell Oil Co.*, 446 U.S. 657, 659 n. 3, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980). Exxon and Tosco, respectively, have spent over a billion dollars and tens of millions of dollars in acquisition, research, development, maintenance, and other expenses relating to oil shale development.

At the time the oil shale claims at issue were located, the 1872 Mining Laws applied. Under the 1872 Mining Laws, a miner who discovered a valuable mineral deposit on Government land received a grant of equitable ownership in the mineral interest directly from Congress. The laws provided that a confirmatory deed or patent from the United States could be obtained upon application to the Department of the Interior and payment of a nominal sum. Prior to the issuance of a patent, the Act required that a claimant expend $500 worth of labor or improvements on the claim. 30 U.S.C. § 29. Additionally, in order to retain a valid claim, the Act required that "not less than $100 worth of labor shall be performed or improvements made during each year." 30 U.S.C. § 28.

On February 25, 1920, the Mineral Leasing Act was enacted, which removed deposits of oil shale and certain other minerals from the category of minerals that were subject to appropriation under the 1872 Mining Laws. Subsequent to the enactment of the Mineral Leasing Act, oil shale deposits owned by the United States could be acquired only by lease. However, the Mineral Leasing Act contained a "savings clause," which provided that claims located prior to the enactment of the Mineral Leasing Act could be reduced to patent and pass into private ownership, if "thereafter maintained in compliance with the laws under which initiated." 30 U.S.C. § 193.

A hearing regarding Exxon's and Tosco's patent applications was held before ALJ Sweitzer on February 10 and 11, 1997, in Denver, Colorado. ALJ Sweitzer issued an opinion on January 9, 1998 holding that: (a) the contested oil shale claims were invalid for failure to substantially comply with the annual assessment work requirement in 30 U.S.C. § 28; (b) the Department of the Interior was not required to bring the charge of default in assessment work prior to expiration of the publication period; (c) a substantial lack

of compliance with the assessment work requirement did and does concern the Government and did and does justify invalidation of an oil shale claim; (d) the resumption doctrine is inapplicable; (e) a claim must be declared invalid if there has been a failure to substantially comply with the assessment work requirement; (f) the performance of $500 worth of assessment work does not constitute substantial compliance with the assessment work requirements of 30 U.S.C. § 28; (g) BLM has proven by clear and convincing evidence a lack of substantial compliance with the assessment work requirement in the case of both Tosco and Exxon; (h) the doctrines of estoppel and laches do not bar invalidation of the claims for failure to substantially comply with the assessment work requirement; (i) the Plaintiffs' due process rights have not been violated; (j) a discovery of a valuable mineral deposit existed on each claim on the date of withdrawal and on the date of issuance of the final certificate because both the physical finding element and the value element of the test for discovery had been satisfied for each claim; and (k) certain listed subdivisions of the Tosco Hydrocarbon Nos. 79, 82, 83, and 86 claims are nonmineral in character for oil shale because the subdivisions occupy a stratigraphic horizon in which the oil shale beds have been completely eroded away and the claims are therefore void.

Exxon filed a notice of appeal with the Salt Lake City Office of the Office of Hearings and Appeal on February 6, 1998. On February 9, 1998, similar notices were filed by Tosco and the BLM. Tosco and Exxon appealed the portion of ALJ Sweitzer's decision which found that a lack of substantial compliance with statutory assessment work requirements imposed by 30 U.S.C. § 28 rendered their claims null and void. BLM challenged the ALJ's finding that a discovery of a valuable mineral deposit existed on each claim.

On August 31, 2000, the IBLA issued its opinion upholding ALJ Sweitzer's decision that a lack of substantial compliance with statutory assessment work rendered Exxon's and Tosco's oil shale claims null and void. The IBLA set aside the portion of ALJ Sweitzer's decision which addressed the question of a discovery of a valuable mineral deposit on each of the subject claims because it concluded such a determination was unnecessary.

## II. Standard

The Administrative Procedures Act, 5 U.S.C. §§ 701–706 (the APA), is the basis for judicial review of agency decisions. Section 706 of the APA provides:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> . . .
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

5 U.S.C. § 706; *see, e.g., Biodiversity Legal Foundation v. Babbitt*, 146 F.3d 1249, 1252 (10th Cir.1998) (administrative decisions are upheld unless they violate § 706(2)(A) or if they are "in excess of statutory . . . authority. 5 U.S.C. § 706(2)(C)"). When applying subsection (2)(A), a court must consider whether the decision is based "on a consideration of all relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136

(1971); *Delta Rocky Mountain Petroleum, Inc. v. United States Department of Defense,* 726 F.Supp. 278, 279 (D.Colo.1989). "The duty of a court reviewing agency action under the 'arbitrary or capricious' standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." *Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560, 1574 (10th Cir.1994). Additionally, the scope of my review is "confined to the agency record or such portions of it which the parties may cite, and additional evidence is not to be admitted." *Roberts v. Morton,* 549 F.2d 158, 160 (10th Cir.1976).

### III. Discussion

Plaintiffs argue that the IBLA's decision that their oil shale claims are null and void for failure to substantially comply with annual assessment work requirements is erroneous. Furthermore, Plaintiffs request that ALJ's Sweitzer's decision that a discovery of a valuable deposit of oil shale existed on each of the contested claims be affirmed.

### A. Right to Resume Work

█ Plaintiffs assert that the statute that created a federal obligation to perform annual assessment work also included the right to resume work which, if exercised before assertion of an adverse challenge, cured a prior lapse in assessment work and preserved an unpatented mining claim. The IBLA concluded that subsequent to the enactment of the Mineral Leasing Act, the resumption doctrine did not apply to oil shale claims where there was a substantial lapse in the performance of the assessment work. I agree with the IBLA.

Section 5 of the General Mining Law of 1872 describes the assessment work requirement and the resumption doctrine:

[O]n each claim ... until a patent has been issued therefore, not less than 100 dollars worth of labor shall be performed or improvements made during each year ... and upon a failure to comply with these conditions, the claim or mine upon which such failure occurred shall be open to relocation in the same manner as if no location of the same had ever been made, provided that the original locators, their heirs, assigns, or legal representatives, have not resumed work upon the claim after failure and before such location.

30 U.S.C. § 28. This section encouraged the development of the mineral deposits in public lands by: (1) requiring that, after locating a claim, a mining claimant perform $100 worth of assessment work for the benefit of each claim each year; and (2) allowing others to obtain possession of public lands covered by mining claims that were not being maintained by the performance of assessment work. Before 1920, the United State's position was that the performance of assessment work was solely a matter between rival or adverse claimants. *See e.g., Nielson v. Champagne Min. & Mill. Co.,* 29 L.D. 491 (1900). This policy was consistent with the state of the law prior to the enactment of the Mineral Leasing Act because the land embraced by a mining claim remained open to the relocation of mining claims. Therefore, the United States would be wasting time and money if it invalidated a mining claim for lack of assessment work when the claimant could simply relocate the claim within minutes after it had been declared null and void.

However, after 1920, oil shale deposits were no longer subject to location and, therefore, existing claims were protected from relocation by a rival claimant. Hence, subsequent to the Mineral Leasing Act, if oil shale claims were immune from

challenge by the United States, "a claim could remain immune from challenge by anyone with or without any assessment work, in complete defiance of the 1872 Act." *Hickel v. Oil Shale Corp.*, 400 U.S. 48, 56, 91 S.Ct. 196, 27 L.Ed.2d 193 (1970). In *Hickel*, the Court held that oil shale claims were not immune from challenge by the United States for lack of assessment work. The Court noted that the United States has "a keen interest in recapturing those [claims] which had not been 'maintained' within the meaning of § 37 of [the Mineral Lands Leasing] Act." *Id.* at 56–67, 91 S.Ct. 196.

Plaintiffs rely on two post –1920 cases which allowed an oil shale claimant to resume assessment work after a lapse in such work. *See Wilbur v. U.S. ex rel. Krushnic*, 280 U.S. 306, 50 S.Ct. 103, 74 L.Ed. 445 (1930); *Ickes v. Virginia–Colorado Dev. Corp.*, 295 U.S. 639, 55 S.Ct. 888, 79 L.Ed. 1627 (1935). *Krushnic* involved oil shale mining claims located on October 1, 1919. Assessment work was not performed for the 1920 assessment year but was performed for the 1921 assessment year. A patent application was filed on September 25, 1922, and a final receiver's receipt was filed on December 16, 1922. The United States argued that the mining claimants had not maintained their claims because assessment work was not performed for the 1920 assessment year. The Supreme Court disagreed, holding that the claimants had maintained their claims by resuming work after the one-year lapse, and the United States could not take advantage of the one-year lapse unless it challenged the claims before the claimants resumed assessment work. *Id.* at 317–18, 50 S.Ct. 103.

The oil shale claims in the *Virginia–Colorado* case were located in 1917, and assessment work was performed for the claims each year thereafter until 1931.

Assessment work was not performed during the year ending July 1, 1931 and, although the mining claimant had not resumed assessment work before the United States challenged the claims in September of 1931, the claimant had made arrangements for the resumption of assessment work which would have been performed but for the intervention of the United States. The Supreme Court held that the mining claimant was maintaining its claims as required by § 37 of the Mineral Leasing Act. *Id.* at 645–47, 55 S.Ct. 888. Furthermore, in dicta, the *Virginia–Colorado* Court indicated that the failure to perform assessment work gave the government no ground for forfeiture, but inured only to the benefit of an adverse locator. *Id.* at 646, 55 S.Ct. 888.

Plaintiffs argue that the *Krushnic* and *Virginia–Colorado* cases have not been overruled and, therefore, they must be followed by this court. However, although the cases have not been reversed they have been limited to their specific facts. *See Hickel*, 400 U.S. at 57, 91 S.Ct. 196. Moreover, the dicta in *Krushnic* and *Virginia–Colorado* has been specifically rejected by the Supreme Court. The Court in *Hickel* stated: "We disagree with the dicta in [*Krushnic* and *Virginia–Colorado*] that default in doing the assessment work inures only to the benefit of relocators, as we are of the view that § 37 of the 1920 Act makes the United States the beneficiary of all claims invalid for lack of assessment work or otherwise." *Hickel*, 400 U.S. at 57, 91 S.Ct. 196.

■ The *Hickel* Court further explained:

We agree with the Court in *Krushnic* and *Virginia–Colorado* that every default in assessment work does not cause the claim to be lost. Defaults, however, might be the equivalent of abandonment; and we now hold that token assessment

work, or assessment work that does not substantially satisfy the requirements of 30 U.S.C. § 28, is not adequate to "maintain" the claims within the meaning of § 37 of the Leasing Act. To hold otherwise would help defeat the policy that made the United States, as the prospective recipient of royalties, a beneficiary of these oil shale claims. We cannot support *Krushnic* and *Virginia–Colorado* on so broad a ground. Rather, their dicta to the contrary, we conclude that they must be confined to situations where there had been substantial compliance with the assessment work requirements of the 1872 Act, so that the "possessory title" of the claimant, granted by 30 U.S.C. § 26, will not be disturbed on flimsy or insubstantial grounds.

*Id.* at 57, 91 S.Ct. 196. Accordingly, subsequent to enactment of the Mineral Leasing Act, if there is not substantial compliance with the assessment work requirements, the oil shale claims revert to the United States.

Plaintiffs also argue that the Department of Interior's own rules conclusively recognize the right to resume work. Defendants admit that for many years the Department's regulations provided that performance of assessment work was "solely a matter between rival or adverse claimants to the same mineral land ... the determination of which is committed exclusively to the courts." *See e.g.,* 43 C.F.R. § 3420.4 (1970); 43 C.F.R. § 185.18 (1949). However, the existence of that regulation did not deter the *Hickel* Court from concluding that the United States "had, and has, subject matter jurisdiction over contests involving the performance of assessment work [for oil shale claims]." 400 U.S. at 57, 91 S.Ct. 196. Therefore, there is no right to resume work.

## B. Requirement of $500 Worth of Work

■ Next, Plaintiffs argue that completion of the $500 worth of work required for issuance of a patent satisfies the requirement of "substantial compliance" of assessment work. I disagree.

The $500 worth of work required for a patent is a separate requirement from the $100 worth of labor or improvements required on each claim each year. As ALJ Sweitzer correctly noted:

> [a]lthough sections 28[, the $100 annual assessment work requirement] and 29[, the $500 worth of work prior to issuance of a patent requirement] both require the expenditure of labor or the making of improvements on a mining claim, they serve two distinct purposes and have distinct minimum standards. The purposes of the section 28 requirement of $100 in annual work are to assure that a claimant undertakes a diligent good faith effort to develop the mining claim, and to prevent the location of mining claims for speculative purposes. *Herr,* 101 Interior Dec. at 117–18 (citing *Chambers v. Harrington,* 111 U.S. 350, 353, 4 S.Ct. 428, 28 L.Ed. 452 (1884)). On the other hand, section 29 requires, without time limitations, the expenditure by a mining claim patent applicant of at least $500 for labor or improvements on a mining claim before it can be patented. The reason for this requirement is that Congress believed that the expenditure of that amount of money, whether in 1 year or 5 years, would demonstrate a claim's value as a mine. 2 AM. L. OF MINING § 51.05[1] (2d ed.1984).

*ALJ Sweitzer's Decision* at 40. Consequently, Plaintiffs' completion of $500 worth of work alone does not satisfy the requirement of substantial compliance of assessment work.

## C. Substantial Lapse in Assessment Work

 Plaintiffs contend that Defendants failed to prove lack of "substantial compliance" with annual assessment work requirements. Defendants argue that the IBLA's holding that there was a substantial lapse in assessment work was based on substantial evidence in the record. I agree with Defendants.

Courts have fashioned general principles to be applied when determining whether work satisfies the assessment work requirement. Those principles are: (1) the work must be performed in good faith; (2) the work must tend to develop the claim; and (3) the work must tend to directly facilitate the extraction of minerals from the claim. *See ALJ Sweitzer Decision* at 41 (citing 2 AM. L. OF MINING § 45.04[5][a] ).

The IBLA stated that its "review of the evidence considered by ALJ Sweitzer convince[d][it] that he was correct in concluding that [Plaintiffs] did not [substantially comply with the annual assessment work] requirement with respect to any of . . . their claims in issue." 153 IBLA 213. ALJ Sweitzer found the following with respect to assessment work:

> [As to the TOSCO claims,] assessment work was required but not performed for the assessment years ending in 1929 through 1931, 1933 through 1957, and 1960 through 1974, with the exception that no assessment work was required for the year ending in 1935 for the Hydrocarbon Nos. 76, 77, 78, 81, 84, and 87 claims, as a notice of intent to hold those claims was filed for that year. Consequently, substantial compliance with the assessment work requirement was not achieved for any of the Tosco claims.

and:

> [As to the Exxon claims,] [w]ith regard to the . . . years ending in 1920 through 1972, the evidence does clearly and convincingly show that no assessment work was performed. Like Tosco, Exxon has submitted no evidence of work to counter the findings of the Departmental examiners that no assessment work was performed for more than 45 years, but rather, relies upon the . . . argument that a field examination cannot clearly and convincingly show a lack of assessment work in prior years.
>
> While erosion, revegetation, and vegetation density are factors affecting a field examiner's ability to locate assessment work, the Departmental examiners were thorough in their examinations and have shown that small excavations dating back to 1920's (the pits on the Tosco claims and those nearby but outside the Exxon claim group) can be located with a high degree of success. Moreover, the finding of no assessment work for the years ending in 1920 through at least 1928 is supported by a contemporary examination of the claims performed in 1928.
>
> . . .
>
> For the years ending in 1973 through 1988, Exxon filed affidavits stating that assessment work worth at least $2,000 or $100 per claim was performed for each year. However, for the year ending in 1974, Exxon claims only $500 worth of work in the form of the installation of culverts and the grading of 15 miles of road. All of the work was road maintenance to allow access to the claims and there is no dispute this work was performed.
>
> However, [Defendants are] correct that this work does not qualify as assessment work. There is not one

shred of evidence that the purpose of the road maintenance was to facilitate development of the claims. Unlike the nearby oil and gas road, the poor roads leading to and traversing the claims were not improved to allow passage of heavy equipment necessary for drilling or other development activity, but rather, they were merely maintained. The roads do not lead to any excavations or other mining activity performed or planned subsequent to 1973 because there have been none. *ALJ Sweitzer's Decision* at 47–50.

These findings were based on the following evidence, some of which ALJ Sweitzer accepted and some of which he rejected.

### 1. Tosco Claims

For the Tosco claims, issuance of the first half of the final certificate occurred on July 27, 1988. Consequently, the annual assessment work requirement applied through the assessment year ending September 1, 1987, with the exception of the year ending July 1, 1932, as the assessment work requirement was suspended for that year, and the year ending July 1, 1935, for the Hydrocarbon Nos. 76, 77, 78, 81, 84, and 87 claims, as a notice of intent to hold those claims was filed for that year.

The Tosco claims were first examined in the summer of 1928 by Warren Sholes, a mining engineer of the General Land Office (GLO). With regard to assessment work, he found numerous cuts and pits and evidence of road and trail work along Brush Creek Canyon. His examination included review of the affidavits that at least $100 worth of assessment work which were filed each year for each of the Tosco claims for the assessment year ending December 31, 1919, through the assessment year ending July 1, 1928. He also interviewed various persons who performed the work. Based on his examination, Mr.

Sholes concluded that less than $100 of assessment work was performed on each claim for at least three years and on all but one of the claims for six years.

ALJ Sweitzer rejected the conclusion of Mr. Sholes. Instead, ALJ Sweitzer concluded that there was not clear and convincing evidence that the required assessment work had not been performed for each of the Tosco claims for the year ending December 31, 1920 through the year ending July 1, 1928. *See ALJ Sweitzer's Decision* at 43.

The claims were examined again in the summer of 1931 by GLO examiners O'Keefe and Cutter. No new work was evident on the claims, indicating that no work had been performed for the assessment years ending July 1, 1929, July 1, 1930, and July 1, 1931.

During the summer of 1986, the Tosco claims and associated records were examined by Edward Ginouves, a BLM mining engineer and mineral examiner, and Rodney Herrick, a BLM geologist. With regard to assessment work, the BLM examiners used a map prepared by Mr. Sholes to locate 22 of the 29 old pits identified on the map. In 1995, Mr. Ginouves completed a mineral report detailing their findings, which included a finding that with the exception of the core hole drilling in 1958 and/or 1959, evidence of assessment work for the period of 1929 through 1974 was not found by the examiners either in the records or on the claims.

A review of assessment work filings revealed that no assessment work affidavits were filed for the assessment year ending July 1, 1929 through the assessment year ending July 1, 1974. Additionally, Mr. Stidd, who was the record title holder of the claims from 1924 to 1974 allowed the claims to be sold for $169.02 in delinquent taxes in 1974.

Based on his discriminating review of the evidence, ALJ Sweitzer concluded that there was clear and convincing evidence that the assessment work requirement was not satisfied for the years ending in 1929 through 1957 and the assessment years ending in 1960 through 1974.

ALJ Sweitzer rejected Tosco's arguments that the construction and maintenance of unpaved roads, excavation of shallow, small surface pits, and stratigraphic sampling are common forms of assessment work which are subject to obscuration if not obliteration by natural processes of erosion and revegetation.

ALJ Sweitzer noted that:

[w]hile it is a distinct possibility that maintenance work on the poor dirt roads and trails would not be detectable in distant future years, such work, under the circumstances, likely was not performed and would not be qualifying in nature. Those circumstances include the absence of any evidence of excavations, drill holes, or other mining activity for the assessment years ending in 1929 through 1957 and the assessment years ending in 1960 through 1974, the lack of economic incentive to develop the claims, and the fact that most of the trails and roads are likely associated with improvements and activities related to grazing rather than mining. For these periods, there is no evidence of mining activity, and little evidence of the likelihood thereof, which might necessitate road maintenance to allow access.

*ALJ Order* at 45.

Based on my review of the evidence, I conclude that the IBLA's determination that Tosco failed to substantially comply with the annual assessment work requirement was not arbitrary and capricious and was not otherwise contrary to law.

## 2. Exxon Claims

ALJ Sweitzer continued his discriminate analysis of the evidence concerning the Exxon claims. For the Exxon claims, issuance of the first half of the final certificate occurred on June 15, 1989. Consequently, the annual assessment work requirement applied through the year ending September 1, 1988, with the exception of the year ending July 1, 1932, as the assessment work requirement was suspended for that year. Defendants concede that the assessment work requirement was met for each of the Exxon claims for the years ending 1957, 1958, 1964, and 1966.

The Exxon claims were first examined by the Department in 1928 by GLO mining engineer Louis Mackel. Based on Mr. Mackel's examination, he concluded that no assessment work had been performed from the time the claims were located in 1919.

Another examination of the Exxon claims and associated records was conducted in the summer of 1984 by BLM mineral examiners Rodney Herrick, Roy Drew, and Edward Ginouves. BLM geologist John Morrone further investigated the claims in September of 1993 and 1995 and with BLM mining engineer, Paul Daggett, in October of 1993. His investigation included examination of aerial photographs of the claim group area taken in 1954, 1962, 1966, 1967, 1973, 1979, 1980, and 1981. Their investigation revealed numerous bulldozer cuts created after the 1967 aerial photos and prior to the 1973 aerial photos. Mr. Morrone concluded that the bulldozer cuts did not satisfy the assessment work requirement because they did not show any valuable mineralization and only served to better expose that which was already naturally exposed. No other evidence of assessment work was discovered.

ALJ Sweitzer concluded that Defendants had not met their burden of clearly and convincingly establishing that the bulldozer cuts did not qualify as assessment work. Therefore, he found that each cut—one on each of the Princess Anne No. 4, Atlantic Nos. 1, 3, 5, 7, and 8, and Washington Nos. 5, 6, 7, and 8 claims and two on the Atlantic No. 6 claim—satisfied the assessment work requirement for one year for the claim upon which it was located.

For the years ending in 1973 through 1988, Exxon filed affidavits stating that assessment work worth at least $100 per claim was performed for each year. However, for the year ending in 1974, Exxon claimed only $500 worth of work (for all 20 of its claims) in the form of the installation of culverts and the grading of 15 miles of road. There is no dispute that this work was performed. However, ALJ Sweitzer concluded that such road work was road maintenance not intended to develop the claim or directly facilitate the extraction of minerals from the claim. Therefore, he concluded the road work did not qualify as assessment work.

Based on this evidence, the IBLA did not act arbitrarily or capriciously in concluding that Exxon failed to substantially comply with the assessment work requirement for each of its claims.

## D. Discovery

Plaintiffs seek affirmance of ALJ Sweitzer's ruling on discovery. ALJ Sweitzer held that a discovery of a valuable mineral deposit existed on each claim on the date of withdrawal and on the date of issuance of the final certificate because both the physical finding element and the value element of the discovery test had been satisfied for each claim. *See ALJ Sweitzer's Decision* at 57–74. The IBLA concluded that because the claims were void for failure to perform annual assessment work,

there was no need to rule on the discovery issue. I agree with the IBLA.

I have affirmed the IBLA's decision regarding assessment work and, therefore, Plaintiffs' claims are void. Hence, there is no need to rule on the discovery issue.

I merely note that if a decision on discovery were required, that decision would fall to the IBLA on remand.

## E. Doctrines of Estoppel and Laches

Plaintiffs contend that they followed the guidance of certain federal employees or offices and, therefore, the United States is estopped from making any argument contrary to that guidance. Defendants argue that case law establishes that estoppel does not lie against them. I agree with Defendants.

■ The Supreme Court has held that erroneous advice of government officials does not normally give rise to a claim of estoppel. *Office of Personnel Management v. Richmond*, 496 U.S. 414, 415–16, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990)(holding that erroneous and written advice given by a Government employee to a benefits claimant ordinarily does not give rise to estoppel against the Government). The Court noted that equitable estoppel does not lie against the government as it would against private litigants. *Id.* at 419, 110 S.Ct. 2465. "Not even the temptations of a hard case" provide a basis of relief. *Id.* at 420, 110 S.Ct. 2465. The Court did not hold that estoppel may never be found against the government, but the only possible exception which it discussed involved affirmative misconduct on the part of a government employee. *Id.* at 421–22, 110 S.Ct. 2465. Plaintiffs do not allege affirmative misconduct on the part of a government employee. Therefore, based on Supreme Court precedent, Plaintiffs' estoppel claim is rejected.

## F. Due Process Rights

Plaintiffs assert that it would violate the Constitution's due process clause to accept Defendants' contentions respecting annual assessment work defaults.

According to Plaintiffs, there was not sufficient notice and an opportunity to defend against Defendants' argument, accepted by ALJ Sweitzer, that the road work performed by them did not qualify as assessment work. Apparently, Plaintiffs complain that they were not prepared to adequately present their case regarding the annual assessment work requirement. However, as pointed out by ALJ Sweitzer, Plaintiffs received written testimony and exhibits, including the testimony and reports of the BLM examiners of the claims, many months before the initial hearing. Additionally, at the hearing, Plaintiffs presented evidence and prehearing statements relating to the adequacy of assessment work. Therefore, I conclude that Plaintiffs had sufficient opportunities to present their cases regarding annual assessment work.

■ Next, Plaintiffs argue that due process requires notice and an opportunity to be heard in any rulemaking respecting a change in the law such as that now asserted by Defendants. Plaintiffs maintain that there was a change of law because the law was well established up until 1970 (when the *Hickel* case was decided) that assessment work was of no concern to the Department of Interior and that any assessment work default challenge could be brought only during a period of default.

On September 1, 1972, the Department amended its regulations to reflect the *Hickel* holding that substantial compliance with the annual assessment work requirement was a matter of concern to the Department. *See* 43 C.F.R. §§ 3851.3, 3851.4 (1973). Prior thereto, Departmental regulations reflected the dicta in *Virginia–Col-*

*orado* that compliance with the annual assessment work requirement was solely a matter between rival or adverse claimants and was no concern to the Department. *See* 43 C.F.R. § 185.18 (1949); 43 C.F.R. § 3420.4 (1970).

On July 15, 1971, before the change of the regulations, there was a published notice and text of the proposed amendment, along with an invitation for public comments, suggestions, or objections. *See* 36 Fed.Reg. 13153 (July 15, 1971)(stating that the purpose of the proposed amendment was to make the regulation consistent with the principles set out in *Hickel*); *see also* 37 Fed.Reg. 17836 (September 1, 1972)(discussing previous notice and comments received and ultimately adopting the proposed amendment without change). This notice provided adequate notice to Plaintiffs as well as an opportunity to be heard. Therefore, Plaintiffs' due process claim fails.

Furthermore, for the additional reason that Plaintiffs did not perform adequate assessment work after the 1970 decision of *Hickel,* their due process claim fails. After the 1970 decision in *Hickel,* the state of the law was clear: the United States was the beneficiary of all oil shale claims which were invalid for lack of assessment work. Even after this decision, the evidence demonstrates that Tosco did not comply with the assessment work requirement from 1970 to 1974 and Exxon failed to comply with the requirement in 1970, 1971, 1972, and 1974. Such failures show that Plaintiffs did not substantially comply with the assessment requirement even after they had notice that substantial compliance was required in order to retain a valid claim. For this alternative reason, their due process claim fails.

## G. Equal Protection

Finally, Plaintiffs contend that their equal protection rights were violated be-

cause there is no compelling reason to treat them differently from the 2,863 similar claims that have already gone to patent. Defendants point out that Plaintiffs do not identify themselves as belonging to a protected class under the Constitution, nor could they.

Plaintiffs do not allege that a fundamental right is at stake, nor do they allege that they are members of a suspect class. However, a plaintiff may bring a claim based on a "class of one." Under such a theory, in order to prevail on an equal protection claim, Plaintiffs must show that Defendants treated them differently than others "similarly situated … and that this different treatment lacked a rational basis." *Landmark Land Co. of Oklahoma v. Buchanan,* 874 F.2d 717, 722 (10th Cir.1989); *see also City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439–40, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Here, Defendants are refusing to patent Plaintiffs' oil shale claims because Plaintiffs failed to comply with the annual assessment work requirement. As discussed above, the purpose of the assessment work requirement is to encourage the development of the mineral deposits in public lands and ensure that they are not used for speculative purposes. Enforcing this requirement serves a rational basis. Therefore, Plaintiffs' equal protection claim is rejected.

I hold that the IBLA's decision is grounded upon a sound consideration of all relevant factors, is not arbitrary and capricious and is not otherwise contrary to law.

Accordingly, it is **HEREBY ORDERED THAT**:

(1) The IBLA's decision is **AFFIRMED**.